IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA BURD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:06-cv-491 |
| ) | **Electronic Filing** |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

May 14, 2007

**I. INTRODUCTION**

Plaintiff, Linda Burd ("Plaintiff"), brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level.

**II. PROCEDURAL HISTORY**

Plaintiff applied for DIB on June 7, 2004, alleging disability as of January 10, 2004. R. 44. The application was denied by notice dated July 28, 2004. R. 31. Plaintiff responded by filing a timely request for a hearing. R. 36. On July 20, 2005, a hearing was held in Morgantown, West Virginia, before Administrative Law Judge Norma Cannon (the "ALJ"). R. 208. Plaintiff, who was unrepresented, appeared and testified at the hearing. R. 210-234. Her husband, Robert C. Burd, appeared and testified on her behalf. R. 227-228. Timothy Mahler, an impartial vocational expert, was present for the entire hearing and testified before its conclusion. R. 229-234. On August 23, 2005, the ALJ issued a decision in which she determined that Plaintiff was not "disabled" within the meaning of the Act. R. 15-23. The Appeals Council

subsequently denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner in this case. R. 4-6.  Plaintiff now seeks review of that decision, and the matter is before this Court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### III.    STATEMENT OF THE CASE

Plaintiff was born on February 8, 1952, making her fifty-three years old at the time of the ALJ's decision.  R. 212.  At that time, she was a person closely approaching advanced age under 20 C.F.R. § 404.1563(d).  Plaintiff graduated from high school and attended college for two years, majoring in early childhood education.  R. 214.  Thereafter, she spent twenty-five years working for Lennox Crystal.  R. 214-216.  She started out as a grinder and later became a sandblaster.  R. 214.  Her employment with Lennox Crystal ended on December 18, 2001, when the plant at which she worked was closed.  R. 227.  Plaintiff did not work subsequent to that date. R. 228.

Dr. Tiffany Pluto is Plaintiff's primary care physician.  R. 228.  Dr. Pluto referred Plaintiff to Dr. Timothy K. Jackson because of her diabetes, hypothyroidism (status post iodine ablation for Grave's disease), and hyperlipidemia.  R. 101.  Dr. Jackson examined her on October 24, 2003, noting that she had balance issues because of a nerve injury.  R. 100.  Plaintiff complained of "chills, sweats, hot flashes, sweats at night, weakness, reduction in vision, dizziness, shortness of breath, drooping of the right eye-lid, intermittent diarrhea, dryness of the skin, night-time urination, [and] swelling of her legs."  R. 100.  Dr. Jackson reported that Plaintiff's blood sugars were reasonably well controlled.  R. 100.  Plaintiff was experiencing both a hot flash and a headache during the examination.  R. 100.  On the date of the examination, Plaintiff had a weight of 208 pounds, a blood pressure of 156/80, a pulse of 92 beats per minute and a respiration of 12 beats per minute.  R. 17, 100.

Plaintiff was examined by Dr. Jackson again on December 12, 2003.  R. 17, 99.  Having stopped drinking soda for a period of six weeks, Plaintiff weighed only 200 pounds, which was eight pounds lighter than on her previous visit.  R. 17, 99.  She had a blood pressure of 130/68, a

pulse of 88 beats per minute and a respiration of 12 beats per minute.  R. 17, 99.  Her cardiac examination was regular, her thyroid was small, and her lungs were clear.  R. 17, 99.

Dr. Karuna S. Manda, a neurologist, examined Plaintiff on January 30, 2004.  R. 17, 123.  Dr. Manda opined that Plaintiff's right eye droopiness and left facial weakness could be the result of a small vessel ischemic stroke.  R. 18, 125-126.  He recommended that Plaintiff have an MRI of the brain, carotid dopplers, an echocardiogram and a blood workup.  R. 126.  Dr. Manda also recommended that Plaintiff maintain a calendar to record her migraine headaches.  R. 126.

Plaintiff underwent an echocardiogram on February 6, 2004, which yielded normal results.  R. 18, 95.  On February 10, 2004, Plaintiff had MRIs of her head and brain.  R. 18, 88-89.  The MRI of her brain revealed "scattered focal signal abnormalities in the white matter consistent with chronic white matter ischemia."  R. 89.  The MRI of her head revealed "a focal narrowing of about 40% seen at the intracranial right internal carotid artery," as well as "a suspected [40-50%] focal narrowing of the left middle cerebral artery M1 segment."  R. 88.  An ultrasound carotid Doppler study revealed "no appreciable plaque."  R. 18, 87.

Plaintiff was examined by Dr. Jackson again on March 26, 2004.  R. 18, 98.  Dr. Jackson noted that Plaintiff had suffered multiple mini-strokes since her previous visit.  R. 18, 98.  Plaintiff's weight was down to 196 pounds.  R. 98.  She had a blood pressure of 128/70, a pulse of 88 beats per minute and a respiration of 12 beats per minute.  R. 98.  Although Plaintiff's thyroid was not enlarged, she had numbness of the left side of her face.  R. 98.  She was instructed to continue taking Lipitor and other anti-stroke medications.  R. 18, 98.

Dr. Manda performed another examination of Plaintiff on May 5, 2004.  R. 18, 120-122.  Plaintiff reported worsening balance problems, episodes of falling and recurrent headaches near her left eye.  R. 18, 120.  Dr. Manda determined that Plaintiff suffered from ataxia, which was potentially related to Meniere's disease and neuropathy.  R. 18, 122.  He recommended EMG nerve conduction studies of Plaintiff's upper and lower extremities for neuropathy, Neurontin for headache prophylaxis, and Plavix for stroke prophylaxis.  R. 122.

Plaintiff was evaluated by Dr. John K. Waas on June 11, 2004.  R. 18, 115-117.  Plaintiff reported that she had experienced neurologic events in December 2003 and May 2004, in which

she experienced left facial numbness and right eye ptosis. R. 18, 115. On the date of the examination, Plaintiff had a weight of 204 pounds, a blood pressure of 130/70, a pulse of 88 beats per minute and a respiration of 18 beats per minute. R. 116. Although the examination revealed normal findings, Dr. Waas noted that Plaintiff's factor V Leiden would increase her risk for venous and arterial thrombosis, particularly in the larger vessels. R. 18, 116. He recommended that she quit smoking and avoid the use of exogenous hormonal therapy. R. 116.

Dr. Frank Bryan, a state agency medical consultant, completed a residual functional capacity assessment form on July 22, 2004. R. 20, 127-136. With respect to Plaintiff's exertional capabilities, Dr. Bryan opined that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. R. 128. He also indicated that she could stand, walk or sit for six hours in an eight-hour workday, and that her pushing and pulling abilities were unlimited. R. 128. Although Dr. Bryan noted that Plaintiff should avoid concentrated exposure to hazards such as machinery and heights, he determined that she had no postural, manipulative, visual or communicative limitations. R. 129-131.

Plaintiff returned for a visit with Dr. Jackson on July 23, 2004. R. 19, 146. On that occasion, Plaintiff had a normal cardiac examination, normal sensation and clear lungs. R. 19, 146. She had a weight of 204 pounds, a blood pressure of 124/62, a pulse of 72 beats per minute and a respiration of 12 beats per minute. R. 146. Plaintiff complained that her muscles hurt often, and that her toes turned purple at night. R. 146. Dr. Jackson speculated that Plaintiff may have been suffering from tinnitus. R. 146.

More tests were conducted to assess Plaintiff's health. On August 25, 2004, a cardiac exercise stress test yielded normal results. R. 19. An MRI of Plaintiff's brain was performed on December 8, 2004. R. 19, 161. Dr. Jesus Cenizal, a radiologist, was left with the following impression:

> There is a [sic] 8 x 6 mm area of abnormal increased signal in the white matter adjacent to the mid body of the right lateral ventricle suggestive of deep white matter ischemia. However, a [sic] MS plaque cannot definitely be excluded.

R. 161. An echocardiogram was conducted on February 2, 2005, along with vascular studies and

Holter monitor studies. R. 19. Although the echocardiogram revealed borderline concentric left ventricular hypertrophy with Doppler evidence of dystolic dysfunction, the results were otherwise normal. R. 19, 201. The results of the vascular and Holter monitor studies were normal. R. 19, 199-200. On April 14, 2005, Plaintiff underwent an intracranial MRI. R. 19, 207. This MRI revealed "atherosclerotic disease with moderate grade focal obstruction of the distal A1 portion of the right anterior cerebral artery." R. 207. Nevertheless, there was no evidence of aneurism or arterial venous malformation. R. 19, 207. Plaintiff also had an MRI of the cervical and thoracic spine on June 15, 2005. R. 19, 205-206. Dr. Frank Papa, the radiologist who examined the findings, noted the presence of arthritic changes and a mild kyphosis. R. 205. There was no evidence of disc bulge, herniation or spinal stenosis. R. 19, 205-206.

Plaintiff began to experience changes in her bowel habits, diarrhea, and occult blood in her stool. R. 19, 203. Dr. Charles Calabrese reported that the following had been found: grade 3 internal hemorrhoids (ligation), polyps in the rectum (polypectomy), a polyp in the hepatic flexure (polypectomy), and erythema and congestion in the ascending colon and descending colon compatible with nonspecific colitis (biopsy). R. 203. The hemorrhoids were treated and the polyps were removed. R. 19.

At the hearing, Plaintiff elected to proceed without the assistance of counsel. R. 210-211. She testified that she suffered from blockage of an artery in the right side of her brain, which caused her to have severe headaches. R. 217. This condition, according to Plaintiff, prevented her from concentrating for a significant period of time and caused her to spend entire days in bed. R. 217. Plaintiff further testified that the blockage in her artery caused her to have pains in her legs. R. 217. She indicated that the muscles in her legs would sometimes become weak, forcing her to sit down. R. 218-219. Although she was able to take short walks associated with activities such as shopping, Plaintiff testified that she often had to sit down periodically while doing so. R. 219. Because she did not trust her road judgment, she stated that she only drove about five miles per week. R. 220. Plaintiff also explained that, because of her diabetes, she often lost her balance. R. 221. Prior to her hearing, Plaintiff had been a diabetic for about five

years. R. 221. She indicated that her balance was also affected by a 1997 operation on her ear, in which her "balance nerve" was cut. R. 225. When the ALJ asked her why she had not attempted to work since the closing of her plant on December 18, 2001, Plaintiff stated that both Dr. Pluto and her neurologist, Dr. Ragoor, had told her that she was not able to work. R. 228. When asked how much she was able to lift, Plaintiff testified that she could lift between fifteen and twenty pounds. R. 229. She explained that she may have had "MS," and that she suffered from protein in her spinal fluid and legions on her brain. R. 229.

Plaintiff's husband, Robert C. Burd, testified that he had gotten phone calls at work indicating that Plaintiff had fallen or lost her balance. R. 227. He explained that she was sometimes in bed for two or three days at a time, trying to get relief from a headache. R. 227. He indicated that, on some occasions, he had come home to find Plaintiff in bed with a headache. R. 227.

The ALJ proceeded to ask Mr. Mahler some hypothetical questions. She described a hypothetical individual with Plaintiff's age, work history and educational background who could perform a range of light[1] work, limited to unskilled work in a relatively low-stress environment, with a sit/stand option, at an entry level, who could perform all postural maneuvers frequently except climbing, and who needed to avoid hazards. R. 232. Mr. Mahler testified that such an individual could work as an inspector-checker, a laundry folder, an assembler of small parts, or a hand packer. R. 232. The ALJ added that the hypothetical individual needed to go to the bathroom once after lunch and two other times throughout the workday. R. 232. Mr. Mahler testified that such an individual's ability to perform the above-mentioned jobs would not be compromised. R. 232. If the hypothetical individual's level of work were reduced from light to

---

[1] 20 C.F.R. § 404.1567(b) provides: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." Identical language is contained in 20 C.F.R. § 416.967(b).

sedentary[2] (with all other limitations remaining the same), Mr. Mahler testified that such an individual could work as a surveillance system monitor, an assembler of small parts, an inspector-checker, or a waxer of glass products. R. 233. Mr. Mahler's testimony established that these jobs existed in significant numbers in the national economy. When asked whether an individual who needed to be off-task one day per week due to headaches could sustain employment in these positions, Mr. Mahler testified that such an individual would not be able to remain employed because it would be easy for an employer to fill such a position with another applicant. R. 233-234.

## IV. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 108 S.Ct. 2541, 2545 (1988). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically

---

[2] 20 C.F.R. § 404.1567(a) provides: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Identical language is contained in 20 C.F.R. § 416.967(a).

7

determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health and Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. § 423(d)(1). A claimant is considered to be unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To support her ultimate findings, an ALJ must do more than simply state factual conclusions. She must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). The ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

**V.     DISCUSSION**

In her decision, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. R. 22. The ALJ found Plaintiff to be suffering from hypertension, diabetes mellitus and graves disease. R. 22. Although these impairments were found to be "severe" for purposes of 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1520(c), the ALJ concluded that they did not meet or medically equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listing of Impairments"). R. 22. In accordance with 20 C.F.R. § 404.1545, the ALJ made the following residual functional capacity assessment:

> [T]he claimant can perform light work with a sit/stand option; can perform all postural activities frequently, except climbing; should not be around hazards; work should be unskilled and low stress entry-level work.

R. 22. Given this assessment, it was determined that Plaintiff could not return to her past relevant work as a grinder or a sandblaster. R. 22. Nevertheless, the ALJ concluded that Plaintiff could work as an inspector/checker, a laundry folder, an assembler of small parts, or a hand packer. R. 22-23. Mr. Mahler's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A). R. 229-234. Consequently, Plaintiff was not found to be "disabled" under 42 U.S.C. § 423(d)(1). R. 23.

In support of her motion for summary judgment, Plaintiff makes three[3] distinct arguments. Doc. No. 9 at 2. First, she contends that the ALJ failed to give adequate consideration to her testimony at the hearing. Second, she argues that, as a result of the inadequate consideration given to her testimony, the ALJ's hypothetical questions to Mr. Mahler were defective. Finally, she asserts that the ALJ's hypothetical questions to Mr. Mahler were inappropriately vague. The Court will proceed to address each argument in turn.

At the outset, the Court acknowledges Plaintiff's admonition that Social Security proceedings are not adversarial, and that an unrepresented claimant is entitled to a degree of leniency throughout the administrative process. Doc. No. 9 at 4. The governing precedents

---

[3]Although Plaintiff actually lists four arguments, the first and fourth arguments are so interrelated that the Court will address them as a single argument. Doc. No. 9 at 2.

recognize that the Commissioner sends no representative before an ALJ to oppose a claim for benefits, and that an ALJ has a duty to develop the record when a claimant is unrepresented. *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000); *Reefer v. Barnhart*, 326 F.3d 376, 380-381 (3d Cir. 2003). Nevertheless, "although the ALJ has a duty to fully explore the facts, the ALJ does not act as counsel for the claimant." *Musgrave v. Sullivan*, 966 F.2d 1371, 1377 (10th Cir. 1992). A close examination of the hearing transcript reveals that the ALJ was fully aware of her obligation to develop the administrative record in this case. R. 211. Consequently, Plaintiff cannot obtain a remand solely on the basis of her decision to proceed without the assistance of counsel at the administrative hearing.

The Court likewise acknowledges Plaintiff's contention that the Commissioner's decision cannot be affirmed on a ground other than that adopted by the ALJ. Doc. No. 9 at 6. In *Securities & Exchange Commission v. Chenery Corporation*, 332 U.S. 194, 196 (1947), the United States Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

In her first argument, Plaintiff contends that the ALJ failed to properly consider her testimony. Doc. No. 9 at 7-10, 17-20. Plaintiff argues that the ALJ inadequately discounted her complaints of recurrent headaches and improperly emphasized her activities of daily living in determining her residual functional capacity. In her opinion, the ALJ referenced several records involving Plaintiff's medical problems. R. 17-19. Although she did not repeatedly use the word "headache" to describe Plaintiff's symptoms, it is clear from the language used in the opinion that the medical evidence to which Plaintiff refers was adequately considered. The ALJ used

such terms as "facial drooping weakness," "right eye ptosis," "left facial droop," and "decreased facial sensation of the left face." R. 17-19. These terms described Plaintiff's impairments with more specificity than would the term "headaches." The ALJ's review of the medical evidence was very detailed and extensive, and this case simply cannot be equated with *Fargnoli v. Massanari*, 247 F.3d 34 (3d Cir. 2001). In *Fargnoli*, the Court of Appeals was concerned that critical pieces of evidence had been overlooked or ignored. *Fargnoli*, 247 F.3d at 43-44. The same cannot be said here. Plaintiff calls the Court's attention to no specific pieces of medical evidence which were ignored by the ALJ. Instead, she relies on the ALJ's failure to give her headaches more prominence in the opinion.

It must be remembered that there is "a distinction between the issue of the existence of a medical condition and the issue of the existence of statutory disability." *Kuzmin v. Schweiker*, 714 F.2d 1233, 1237 (3d Cir. 1983). Contrary to the contentions of Plaintiff, there is no inconsistency in the ALJ's opinion. Although the ALJ found Plaintiff's testimony to be "substantially credible," the ALJ nevertheless believed that such testimony did not support a finding of statutory disability. R. 19. The ALJ likewise found the testimony of Plaintiff's husband to be "credible but inconsistent with total disability." R. 20.

It is axiomatic that "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). In the instant case, the ALJ did not discount Plaintiff's allegations of pain. Instead, she concluded that such pain was not disabling. R. 19-20. For this reason, the ALJ found Plaintiff's "allegations regarding her limitations" to be "not totally credible." R. 22. "Residual functional capacity is defined as that which an individual is still able to do despite the *limitations* caused by his or her *impairments*." *Pearson v. Barnhart*, 380 F.Supp.2d 496, 505 (D.N.J. 2005)(emphasis added). Impairments which do not result in limitations are irrelevant to the residual functional capacity assessment. Despite Plaintiff's contention that the ALJ made no findings with respect to her headaches, it is clear from the context of the ALJ's opinion that Plaintiff's headaches were not viewed as having caused the degree of *limitation* alleged by Plaintiff.

The ALJ did not determine Plaintiff's residual functional capacity in a vacuum. Instead, she relied on Dr. Bryan's findings to support her residual functional capacity assessment. R. 20. In *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991), the Court of Appeals explained that an ALJ may rely on the report of a nonexamining physician even where that report contradicts the findings of a treating physician, at least where the findings of the treating physician are "internally contradictory." In the instant case, Plaintiff does not rely on any specific medical opinion to rebut Dr. Bryan's assessment. Consequently, at least with respect to the medical records that were before the ALJ, Dr. Bryan's report was uncontradicted.[4] Although Plaintiff testified that Dr. Pluto and Dr. Ragoor had told her that she could not work, their opinions were not otherwise memorialized in the record. R. 228. Even if these opinions were clearly articulated in the treatment notes, "a statement by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue." *Adorno*, 40 F.3d at 47-48. Moreover, the Court notes that Plaintiff's testimony about the verbally expressed opinions of Dr. Pluto and Dr. Ragoor was in response to a specific question posed by the ALJ:

[ALJ]: Have you made any efforts to work at any job since 2001?

[Plaintiff]: No.

[ALJ]: Since you left Lennox?

[Plaintiff]: No.

[ALJ]: Okay.

[Plaintiff]: Both my doctors have told me that I can't work. Dr. Pluto and Dr.

---

[4]The record contains written assertions by Plaintiff that both Dr. Pluto and Dr. Manda had advised her not to work. R. 36, 78. These second-hand notations, however, did not come from "acceptable medical sources" within the meaning of 20 C.F.R. § 404.1513(a). Instead, they came directly from Plaintiff herself. The record also contains a letter from Ronald W. Grimm, who worked with Plaintiff at Lennox Crystal. R. 85. Apparently, Plaintiff had planned to call Mr. Grimm as a witness at the hearing. Although this letter came from an acceptable "non-medical source" under 20 C.F.R. § 404.1513(d)(4), it did not constitute "medical evidence." Therefore, Dr. Bryan's residual functional capacity assessment was virtually uncontradicted. The conclusory statements by Plaintiff and Mr. Grimm with respect to Plaintiff's alleged inability to work were not specific as to particular functions that her impairments rendered her unable to perform.

>Ragoor.
>
>[ALJ]: Okay.
>
>[Plaintiff]: In fact, Dr. Pluto just told me that again yesterday.
>
>[ALJ]: Dr. Pluto and Dr.--
>
>[Plaintiff]: Ragoor.  R-A-G-O-O-R.
>
>[ALJ]: Now what do these doctors do for you?
>
>[Plaintiff]: Dr. Ragoor is my neurologist.
>
>[ALJ]: Okay.
>
>[Plaintiff]: And Dr. Pluto is just my regular doctor.
>
>[ALJ]: Okay.  Takes care of your diabetes and everything?
>
>[Plaintiff]: Yes.
>
>[ALJ]: Why is it that they tell you that you can't work?
>
>[Plaintiff]: Because of the balance problem and the headaches, and the no concentration.

R. 228-229.  According to Plaintiff's testimony, her balance problem was caused by both her diabetes and the cutting of her balance nerve during a 1997 operation on her ear.  R. 221, 225-226.  Her employment with Lennox Crystal ended on December 18, 2001, when the plant at which she worked was closed.  R. 227.  Plaintiff did not allege that she was statutorily disabled until January 10, 2004.  R. 44.

Although the degree of limitation alleged by Plaintiff was not accepted by the ALJ, Plaintiff's impairments (and resulting limitations) were accounted for in the ultimate residual functional capacity determination.  In order to accommodate Plaintiff's balance problems, the ALJ indicated that she was precluded from frequent climbing and that she needed to avoid hazards.  R. 22.  Because of Plaintiff's concentration problems, the ALJ limited her to "unskilled and low stress entry-level work."  R. 22.  Plaintiff's blocked artery, which caused both headaches and leg weakness, was reflected in the ALJ's determination that she could only perform "light work with a sit/stand option."  R. 22.  Aside from her own assertions at the hearing, and those of her husband, Plaintiff points to no evidence which establishes that the degree of limitation caused

by her impairments exceeded the degree of limitation reflected in the ALJ's residual functional capacity assessment.

Plaintiff also contends that the ALJ placed too much emphasis on her activities of daily living. It is clear that a claimant's activities of daily living are relevant to the residual functional capacity assessment. 20 C.F.R. § 404.1529. The Court acknowledges that a claimant's sporadic activities do not constitute substantial evidence that he or she is capable of engaging in substantial gainful activity, particularly where the medical evidence contained in the record supports a finding of disability. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)("What we are left with is a rejection of medically credited symptomatology based solely on the administrative law judge's observation of the claimant at the hearing, and claimant's testimony that he took care of his personal needs, performed limited household chores, and occasionally went to church. That is not permissible."); *Swope v. Barnhart*, 436 F.3d 1023, 1026, n. 4 (8th Cir. 2006)("[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."), quoting *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995). In the instant case, however, the ALJ's findings with respect to Plaintiff's daily activities are not contradicted by medical evidence. They are contradicted only by the testimony of Plaintiff and her husband. Contrary to the assertions made by Plaintiff, the ALJ did not mischaracterize her testimony. Instead, the ALJ found her testimony to be "substantially credible" with respect to her impairments but "not totally credible" with respect to the degree of limitation caused by those impairments. Consequently, the ALJ's treatment of Plaintiff's testimony was not improper, and the conclusions drawn therefrom are supported by substantial evidence.

Since Plaintiff's second argument is inextricably linked with her first, it necessarily falls for the same reasons. She argues that Mr. Mahler's testimony did not constitute "substantial evidence" under 42 U.S.C. § 405(g) because the hypothetical questions posed by the ALJ did not include all of her "limitations and impairments." Doc. No. 9 at 10. The Court acknowledges that the burden is on the Commissioner at the fifth step of the sequential evaluation process. *Allen v. Barnhart*, 417 F.3d 396, 401, n. 2 (3d Cir. 2005); *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir.

14

2000).  It is also true that a hypothetical question must include all of a claimant's limitations in order for the vocational expert's answer to that question to constitute "substantial evidence." *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).  Nonetheless, not every limitation *alleged* by a claimant must be included within the ALJ's hypothetical question to the vocational expert.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  Instead, a residual functional capacity assessment (and a hypothetical question based on that assessment) must include only those limitations which are found to be *credibly established* in the record.  *Id.*  Since the Court has already determined that the ALJ's residual functional capacity assessment is supported by substantial evidence, it follows that Mr. Mahler's testimony (which was based on that assessment) constitutes substantial evidence that jobs exist in the national economy which Plaintiff could perform.

This point is illustrated by the very precedent upon which Plaintiff relies.  In *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002), the Court of Appeals determined that a hypothetical question posed to a vocational expert was defective because it did not incorporate the claimant's "borderline intellectual functioning."  In that case, the ALJ had omitted a *limitation* when posing a hypothetical question to the vocational expert.  In this case, no limitation was omitted from the ALJ's hypothetical questions to Mr. Mahler.  Although Plaintiff asserts that her migraine headaches caused her to be nonfunctional for several days at a time, the ALJ did not find this limitation to be credibly established.  R. 20 ("The claimant's husband's testimony regarding the claimant's past medical problems is credible but inconsistent with total disability.").  The ALJ simply did not believe that Plaintiff's impairments caused the degree of limitation alleged by Plaintiff and her husband.  Since the ALJ's conclusion is based primarily on Dr. Bryan's assessment, which was contested only by the testimony of Plaintiff and her husband (since the medical evidence does not directly establish that Plaintiff's physicians found her to be disabled), the Commissioner's decision is supported by substantial evidence.

In her final argument, Plaintiff contends that the ALJ's hypothetical questions to Mr. Mahler were impermissibly vague, thereby precluding reliable answers.  Doc. No. 9 at 14-16.  Specifically, she argues that the ALJ's reference to a "sit/stand option" was insufficient to

establish "the timeframes for alternate sitting and standing." Doc. No. 9 at 16. She relies on the language of Social Security Ruling 96-9p, which provides that "[t]he [residual functional capacity] assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." Doc. No. 9 at 16. The Commissioner argues that the jobs identified by Mr. Mahler would enable Plaintiff to sit or stand at will, thereby mooting any discrepancies between the vaguely-defined "sit/stand option" and Plaintiff's particularized need to sit or stand for specified periods of time. Doc. No. 11 at 12. A close examination of the hearing transcript reveals that the Commissioner is correct:

> [ALJ]: At this time, Mr. Mahler, did you testify according to the definitions contained in the DOT?
>
> [Mr. Mahler]: I did, Your Honor. The only discrepancy is that the DOT definitions did not describe a sit/stand option, per se. The reason I offered these jobs is, based on my experience in placing disabled workers for the past 25 years, that I found these types of jobs typically permit the worker to sit and stand while doing essential duties.

R. 234. Given this testimony, the "sit/stand option" described by the ALJ, and reflected in Mr. Mahler's testimony, is consistent with jobs which would allow Plaintiff to sit or stand *at her option*. For this reason, any perceived lack of specificity in the term "sit/stand option," as it was used by the ALJ in the instant case, is of no dispositive significance.

Plaintiff states that "a claimant for disability benefits who has a long and productive work history must be given significant credibility when describing his or her work limitations," particularly "when a claimant has attempted to return to work after first becoming unemployed." Doc. No. 9 at 17. It is difficult to fathom how Plaintiff believes that this assertion helps her case more than it hurts it. At the hearing, Plaintiff testified that her employment with Lennox Crystal ended on December 18, 2001, due to the closing of the applicable plant. R. 227. She further testified that she had not made any attempts to return to work subsequent to that date. R. 228. Her alleged onset of disability did not occur until January 10, 2004, which was more than two years after Plaintiff had stopped working. R. 44. The Court does not question the sincerity of Plaintiff's testimony, nor does the Court doubt Plaintiff's motivation to work. That is not the role of the Court in a case brought pursuant to 42 U.S.C. § 405(g). The Court points this out only

to illustrate why the ALJ's assessment of Plaintiff's testimony was not unreasonable, and why the Commissioner's ultimate determination of non-disability is supported by substantial evidence. The decision of the Commissioner must be affirmed.

## VI.     CONCLUSION

For the foregoing reasons, the Court finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, pursuant to 42 U.S.C. § 405(g), the Commissioner's determination that Plaintiff was not entitled to disability insurance benefits will be affirmed. An appropriate order will follow.

s/ David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc:     Karl E. Osterhout, Esq.
        1789 S. Braddock Ave., Suite 570
        Pittsburgh, PA 15218

        Lee Karl, Esq.
        Assistant United States Attorney